SCOTT A. SUGARMAN (No. 68277)
SUGARMAN & CANNON
737 Tehama Street, No. 3
San Francisco, Ca. 94103
Telephone: (415) 362-6252
Facsimile: (415) 362-6431
scott@sugarmanandcannon.com

Attorneys for Defendant
    DEANTAE KENNEDYPALMER

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) No. CR 19-0043 YGR |
| Plaintiff, | ) |
| v. | ) |
| DEANTAE KENNEYPALMER, | ) DATE: October 29, 2020<br>) TIME: 10:30 a.m. |
| Defendant. | ) |

**DEANTAE KENNEDYPALMER'S REQUEST TO REMAIN OUT OF CUSTODY AND TO SELF-SURRENDER PURSUANT TO 18 U.S.C. §§ 3143 AND 3145**

Deantae Kennedy Palmer comes before this Court to enter a guilty plea to a single count of possession of cocaine with intent to distribute.  This Court may proceed with sentencing at the same hearing.  The government has advised the Court it will likely seek his remand in court under 18 U.S.C. § 3143(a)(2).  By contrast, the PSR recommendation notes that while Mr. KennedyPalmer is subject to that statute's limitations,

> the defendant has kept all court appearances, complied with conditions of pretrial release, and is not viewed as a flight risk or a danger to the community. Therefore, the defendant could be <u>a good candidate for voluntary surrender</u>.

PSR Recommendation at 3, emphasis added.

Assuming this Court decides to impose a custodial sentence, this Court need not, and should not, remand him.  He is eligible for probation as noted in the PSR. Further, as detailed in his Sentencing Memorandum, there are other judicial choices that are far more appropriate than a prison sentence. Even if this Court imposes a custodial sentence, Mr. KennedyPalmer asks this Court to conclude either that remand is not authorized, or if authorized, that he should be allowed to self-surrender.

Where a defendant has been convicted of a drug crime carrying a maximum sentence of 10 years or more, the law generally calls for detention pending imposition of sentence unless certain conditions are met.  18 U.S.C. § 3143(a)(2).  However, self-surrender is appropriate in such cases where clear and convincing evidence shows the defendant "is not likely to flee or pose a danger to the safety of any other person or the community if released" (18 U.S.C. § 3143(a)) and there are "exceptional reasons" justifying release.  18 U.S.C. § 3145(c).  *United States v. Garcia*, 340 F.3d 1013, 1018 (9th Cir. 2003).[1]

Congress has placed "broad discretion in the district court to consider all the particular circumstances of the case before it and draw upon its broad experience with the mainsprings of human conduct" in determining whether release is appropriate.  *Id.,* at 1018 [citation and internal quotation marks omitted]. The Ninth Circuit has placed "no limit on the range of matters the district court may consider." *Id.*, at 1018-19.[2]  The position adopted by the Ninth Circuit is the view

---

[1] "A person subject to detention pursuant to sections 18 U.S.C. section 3143(a)(2) or (b)(2) and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released under appropriate conditions by the judicial officer if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate."

[2] It is of no moment that *Garcia* considered the standards for release pending appeal rather than release following a guilty plea.  The presence of "exceptional" circumstances justifying release is required both for release pending appeal and for release pending imposition of sentence following a guilty plea or sentencing.  18 U.S.C. §§ 3143 and 3145.

adopted by virtually all Circuits: "The First, Second, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Circuit Courts of Appeal have all indicated that district courts may release a person for "exceptional reasons" subject to § 3145(c)."  *United States v. Williams*, 903 F.Supp.2d 292, 295 (M.D. Pa. 2012).

   "Exceptional reasons" must be something more than ordinary reasons that otherwise support a defendant's release. *United States v. Koon*, 6 F.3d 561, 562 (9th Cir. 1993) (Rymer, J. concurring). Exceptional reasons are those that are "out of the ordinary," "uncommon" or "rare." *Id.* at 563-564. As such, "[f]inding circumstances that are 'out of the ordinary' is not an onerous hurdle to surmount. 'Exceptional' does not mean 'extreme' or 'novel,' but simply 'infrequent' or 'uncommon.'"  *United States v. Reboux*, 2007 WL 4409801, at *2 (N.D. N.Y. 2007) (unpublished) (citing *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 56 (2d Cir. 2002) and *United States v. DiSomma*, 951 F.2d 494, 496, 497-498 (2d Cir. 1991)).  Accord *United States v. Winsor*, 890 F.Supp.2d 1257, 1260 (D. Or. 2012).

   The Ninth Circuit in *Garcia* made clear "exceptional reasons" include, but are not limited to, that "the defendant's criminal conduct was aberrational," that "the defendant led an exemplary life prior to his offense and would be likely to continue to contribute to society significantly if allowed to remain free on bail," and that the offense "did not involve any threat or injury to persons."  340 F.3d at 1019.  A district court may also consider "circumstances that would render the hardships of prison unusually harsh for a particular defendant" (*id.*, at 1020), and may ask "whether because of particular circumstances the defendant is *exceptionally* unlikely to flee or to constitute a danger to the community if he is permitted to remain free[.]"  *Id.*, at 1021 (emphasis in the original).  This list is not exhaustive, as the district court may consider any fact, or combination of facts, that lead the court to conclude that exceptional reasons warrant continuing to leave the defendant out of custody.

For example, in *Williams*, defense counsel argued extraordinary circumstances were rooted in the defendant's family circumstances.  The defendant and his wife had given birth to a child approximately one year prior to the guilty plea.  As a result of the birthing process, his wife required surgery to repair an umbilical hernia, for which she would need six weeks of convalescence before returning to work.  In that period, Williams' income would be the sole means of support for his wife and their three young children. In addition, the couple had a teenage son with severe ADHD, who needed counseling. 903 F. Supp. 2d at 293.  The Court held those family circumstances constituted "exceptional circumstances" – indeed, the Court stated it would be "inappropriate and unjust" to detain Williams and permitted him to remain out of custody.  *Ibid.*

In short, section 3145(c) provides that a defendant who pleads guilty to an offense that commonly requires remand into custody under section 3143(a)(2) is nevertheless entitled to continued release and allowed to self-surrender if 1) the defendant shows exceptional reasons for continuing release and 2) he meets the conditions under section 3143(a)(1) – the court finds by clear and convincing evidence that the defendant is not likely to flee or pose a danger to the safety of others.

Thus, this Court has the authority to leave Mr. KennedyPalmer out of custody even after plea and sentencing. *United States v. Garcia*, *supra*, 340 F.3d at 1015.   Accord *United States v. Little*, 425 F.3d 1210 (8th Cir. 2007).  As the Sixth Circuit held in *United States v. Christman*, 596 F.3d 870 (6th Cir. 2010), "a defendant subject to detention under § 3143(a)(2) may be released if it is 'clearly shown', among other things, that there are "exceptional reasons" why his detention is inappropriate."  As one district court opined, "in combination with other factors, family

circumstances may warrant release pending sentencing pursuant to § 3145(c)."   *United States v. Lippold*, (S.D.N.Y. 2001) 175 F.Supp.2d 537, 541.[3]

Mr. KennedyPalmer has satisfied the three conditions for continued release.

The first two conditions are circumstances routinely considered by courts in deciding whether to detain or release a defendant: is he/she a flight risk or a danger to the community. The overwhelming evidence is that he is neither a flight risk nor a danger.  The PSR concurs in that conclusion.

Mr. KennedyPalmer has no prior criminal convictions.  Mr. KennedyPalmer was released from custody at his first court appearance on a modest bond, co-signed by family.  He has been out of custody for almost two years. In that time, he has committed no new crime nor even been arrested for a new offense.  He has contacted Pretrial Services faithfully and attended all court appearances.  He has tested negative for drugs or alcohol.  Until the advent of the pandemic, he worked two jobs.  He worked full-time as an electrician for Braun Electric.  He was laid off when the business closed down in March 2020 due to the pandemic and orders from national, state and local government officials to shut-down. Indeed, he was set to begin an apprenticeship training program for a better job in April 2020, but the pandemic forced the cancellation of the training course.  Letters confirming that status are attached to his Sentencing Memorandum.  In addition, for several years Mr. KennedyPalmer has worked, and continued to work as an in-home care provider for his grandmother.  See her letter attached to the Sentencing Memorandum.

---

[3] For example, in *United States v. Charger,* 918 F. Supp. 301 (D.S.D.1996), the court allowed a Native American defendant convicted of assault to be released pending sentencing under § 3145(c). The court noted that there may be grounds for a downward departure at sentencing and found that the defendant was in need of the guidance and support that his father would provide; that he was being released to his father, who would provide a structured home where no drinking or smoking was permitted; and that the defendant was engaged in outpatient alcohol treatment. *Id.* at 303–304.

Mr. KennedyPalmer acknowledges that he was arrested in possession of a loaded handgun.  However, the drug offense to which he intends to plead guilty is not a crime of violence; indeed, even possession of a firearm by a felon – and he is not a felon – is not deemed a crime of violence.  Upon getting out of the car in which he had been asleep at the command of an officer, he immediately told the officer that he had a gun; there was no resistance or violence.  He has never been charged with, or convicted of, any crime of violence.  There is no evidence that he was engaged in any drug sales or any other after his arrest in January 2019, which led to the charge in this Indictment.

Hence, there is compelling evidence he is neither a flight danger nor a danger to the community.   See *United States v. Williams*, *supra*, 903 F. Supp. 2d at 302 [finding defendant was not a flight risk nor a danger to the community based on 1) good performance on two years of supervised release; 2) no violent acts during the drug conspiracy to which he pled guilty; 3) his employed; and 4) attendance at all court appearances].

The third factor -- whether there are exceptional circumstances – is demonstrated by several facts, jointly and severally.

First, as this Court is well aware, the elephant in the room is the Covid-19 pandemic.  The world has not seen its like in over 100 years.

As of the preparation of this Request, the United States is experiencing a third wave of virus infections and deaths.  In the United States alone, more than 225,000 people have died with a diagnosis that death was caused by the coronavirus – there are almost certainly many more who have died of the coronavirus.  On Friday, October 23, 2020, there were more than 85,000 new infections daily diagnosed in the United States, the highest total daily number ever during the pandemic – given limited testing and people who avoid testing, the number of new daily

infections is likely much higher.  Hospitalizations are up 40% in the United States.

https://www.nytimes.com/2020/10/23/us/covid-worst-day.html.  More than 1,000,000 have died

worldwide.  There are more than 8,000,000 confirmed infections worldwide, a number that

grows substantially each day.  While we might like to think the worst days of the pandemic

occurred months ago, that is simply not correct.

The coronavirus has been particularly deadly in enclosed community spaces, such

assisted living centers and custodial facilities.  Incarcerated individuals "are at special risk of

infection" and "infection control is challenging."[4] Even in the best of times, prisons and jails

have "long been known to be associated with high transmission probabilities of infectious

diseases."[5]

As this Court is well aware, the Covid-19 pandemic has been widespread and devastating

to inmates in custodial facilities.  Correctional facilities are group environments, where residents

live, eat, and sleep in close contact with one another; infectious diseases are more likely to spread

rapidly between individuals.[6]  Prisons and jails "contain high concentrations of people in close

proximity and are breeding grounds for uncontrolled transmission [of infection]."  Incarcerated

individuals share bathrooms, sinks, and showers. They eat together, and sleep in close proximity

to each other. They often lack access to basic hygiene items, much less the ability to regularly

---

[4] Open Letter from Gregg S. Gonsalves, Assistant Professor, Department of Epidemiology of Microbial Diseases, Yale School of Public Health, et al. to Vice President Mike Pence and Other Federal, State and Local Leaders 4 (Mar. 2, 2020), https://bit.ly/3eKXc5i (co-signed by 814 experts in public health, law and human rights).  See also Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047-155 (2007), https://doi.org/10.1086/521910.
[5] https://bioethics.jhu.edu/wpcontent/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf (cosigned by over 200 faculty members of Johns Hopkins Bloomberg School of Public Heath, School of Nursing, and School of Medicine).
[6] https://www.ncchc.org/filebin/news/COVID_for_CF_Administrators_3.9.2020.pdf

disinfect their living quarters. "The conditions and reality of incarceration makes prisons and jails tinderboxes for the spread of disease."[7]  In short, "our jails are petri dishes."[8]

This is particularly true for airborne diseases, such as COVID-19, which makes this virus particularly dangerous in a correctional facility.  The World Health Organization stated that people who are incarcerated and otherwise deprived of their liberty are generally more vulnerable to disease and illness.[9]  "The very fact of being deprived of liberty generally implies that people in prisons and other places of detention live in close proximity with one another, which is likely to result in a heightened risk of person-to-person and droplet transmission of pathogens like COVID-19."[10]

The transient nature of prisons and jails also contributes to the likelihood of outbreak. Not only are defendants entering prison on a regular basis, but so are correctional officers and staff.  Correctional officers and medical staff usually enter prisons in three shifts each day, increasing the chances that the virus will spread throughout the prison.

As of October 19, 2020, the Bureau of Prisons reported there were currently nearly 1,700 infected inmates and 774 staff with confirmed positive Covid-19 test results.  In addition, more than 14,500 inmates, and more than 1,250 staff, have been infected and recovered.  127 federal

---

[7] https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-afederal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html downloaded 5/18/20.

[8] https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html downloaded 5/18/20.

[9] Preparedness, Prevention and Control of COVID-19 in Prisons and Other Places of Detention: Interim Guidance, World Health Organization: Regional Office for Europe, 2 (Mar. 15, 2020), http://www.euro.who.int/__data/assets/pdf_file/0019/434026/Preparedness-prevention-and-control-of-COVID-19-in-prisons.pdf.

[10] "Preparedness, prevention and control of COVID-19 in prisons and other places of detention," WHO Interim Guidance, 15/03/20, p.2.

1   inmate deaths and 2 staff member deaths have been attributed to Covid-19.

2   https://www.bop.gov/coronavirus/.

3      This Court is aware of the horrific spread of the coronavirus in San Quentin prison –

4   nearly three-quarters of the inmates tested positive for coronavirus.  Twenty-eight have died.  As

5   reported on October 20, 2020, the California Court of Appeal [*In re Von Staich*, No. A160122]

6   found the response of prison officials so awful that the Court ordered half the inmates moved out

7   of San Quentin prison.  The Court held prison officials acted with not merely reckless

8   indifference, but deliberate indifference, to the lives of the inmates there: "We agree that

9   respondents — the Warden and CDCR — have acted with deliberate indifference and relief is

10  warranted,"  https://www.politico.com/states/california/story/2020/10/20/court-orders-san-

11  quentin-to-halve-inmate-population-1328262 (quoting the court's opinion).

12      Judges in this District have considered whether it is appropriate to release a defendant or

13  delay self-surrender due to the current pandemic.  For example, the defendant in *United States v.*

14  *Garlock*, CR 18-0418 VC was out of custody when sentenced in January 2020 to a year and day.

15  The Court ordered Mr. Garlock to surrender in June 2020. In granting an extension of Mr.

16  Garlock's self-surrender date, the Court wrote [Doc 41]:

17      By now it almost goes without saying that we should not be adding to the prison
       population during the COVID-19 pandemic if it can be avoided. Several recent
18     court rulings have explained the health risks—to inmates, guards, and the
       community at large—created by large prison populations. [Cits.] The chaos has
19     already begun inside federal prisons—inmates and prison employees are starting
       to test positive for the virus, quarantines are being instituted, visits from outsiders
20     have been suspended, and inmate movement is being restricted even more than
       usual. *See, e.g.*, Sadie Gurman, *Bureau of Prisons Imposes 14-Day Quarantine to*
21     *Contain Coronavirus*, Wall Street Journal (March 24, 2020),
       https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-
22     contain-coronavirus-11585093075. To avoid adding to the chaos and creating
       unnecessary health risks, offenders who are on release and scheduled to surrender
23     to the Bureau of Prisons in the coming months should, absent truly extraordinary

circumstances, have their surrender dates extended until this public health crisis has passed.

*United States v. Garlock*, No. 18-cr-00418-VC-1, 2020 U.S. Dist. LEXIS 53747 (N.D. Cal. Mar. 25, 2020).

In another recent case, the magistrate ordered the defendant released.  In response to the government's appeal, Judge Chhabria affirmed the release order, but set a date for the return of the defendant to Santa Rita Jail.  The defendant later moved to extend his temporary release; Magistrate Cousins extended the temporary release from July 24, 2020 to September 25, 2020. In responding to the government's argument that but-for the pandemic the defendant would be in custody, the Court commented:

> The Court expects that the next report from the government in this case will address the reality of the present situation (in which ten percent of the federal detainees at Santa Rita Jail are currently testing positive for COVID19), rather than a fantasy world ignoring the risk to the life and health of defendants, jail staff, and the community at large presented by the pandemic.

*United States v. Evans*, 20-cr-0004-VC, Doc 28. The Court thereafter extended the defendant's release to December 18, 2020 in light of the continuing pandemic.  Doc 42.

In short, committing Mr. KennedyPalmer to custody today imposes a needless risk to his life and health that, we hope, in a modest amount of time can be ameliorated. Given Mr. KennedyPalmer's good behavior since release nearly two years ago, the risk to his health greatly outweighs the risk to the community.

In addition, several aspects of his personal circumstances constitute "exceptional" reasons for a delay in incarceration, if any custodial time is warranted [as further discussed in Deantae KennedyPalmer's Sentencing Memorandum].

First, because has suffered no prior convictions, it is fair to say his criminal activity was aberrational; his conduct did not involve any violence.

Second, as documented in the PSR, during the nearly two years of pretrial release, he has performed extraordinarily well and has cut ties with his former "associates" [as further government investigation confirmed and the government so reported in pleadings with this Court].

Third, he is a parent of a four-year-old son, Deantae.  He has custody of his son half-time, with the child's mother having custody at other times.  However, the child's mother, Emani Lee, works full-time as a nursing assistant at Highland Hospital and thus much of their son's care falls to Deantae.  She cannot both care for their four-year-old son and work to support him.  He has taken his son to and from daycare daily for several years [as attested by the preschool director] and has a close bond with his son, who he loves deeply.

Fourth, he continues to provide home health care to his grandmother, Terry Palmer, who needs his assistance.  As Ms. Palmer wrote in a letter attached to the Sentencing Memorandum documented, Ms. Palmer suffers from fibromyalgia, protruding disc in my low back and neck, spinal stenosis and respiratory issues.  Mr. KennedyPalmer comes by each evening to help her around the house, do her laundry and shopping, house cleaning and taking her to medical appointments as necessary.

As confirmed in the PSR investigation, and further detailed in the Sentencing Memorandum, Mr. KennedyPalmer had a very challenging childhood, that may be fairly said to have formed the foundation for his current drug offense.  His parents were only in their mid-teens when Deantae was born.  He was raised with violence both inside his home and on the streets surrounding his home.  His parents were drug users and argued often, including physical confrontations witnessed by Deantae.  On one occasion, Deantae's father punched him in the face.  His father was in and out of custody often for crimes of violence and drug offenses.

Deantae was raised in a home where marijuana was regularly smoked by his parents; he began to use marijuana at age 10 and continued heavy daily use until this arrest in January 2019.

The neighborhoods where he grew up were rife with drugs and violence.  Unfortunately, there was not just violence and gunfire around him, violence came into his home.  As detailed in the Sentencing Memorandum, his favorite uncle, the person who was helping him learn to play football, which he loved, was shot and killed when Deantae was 11-years-old.  His funeral was on Deantae's 12th birthday.  Thereafter, with almost annual precision, as detailed in his Sentencing Memorandum, he suffered the death of friends from gun violence on the street – he watched his close friends gunned down by drive-by shooters, over and over again.

As a human being, he was traumatized; as a poor person in a poor neighborhood, he received no counseling, no help addressing his grief, fear and depression.  He self-medicated with illegal drugs to reduce his fears and pain.  He never received mental health counseling for the trauma he experienced both at home and on the streets until he was placed on pretrial supervision two years ago.

Once released under Pretrial Services supervision, he began mental health counseling for the first time in his life.  As confirmed in the PSR, he has attended regularly and has found counseling helpful.  In *Garcia*, the Court explained that the district court can consider "the desirability of maintaining an uninterrupted course of treatment while a defendant remains in the care of a particular physician who is providing individual medical supervision to the patient." This includes the consideration of mental as well as physical "well-being-risks." A defendant's continued participation in treatment may be an "exceptional reason" as defined in § 3145(c). *Garcia*, 340 F.3d at 1019-1020,

The presumption of incarceration is premised on the Court's acceptance of his guilty plea and conclusion of sentencing.  If this Court delays the conclusion of these proceedings, then the statutory presumption does not apply.  If this Court concludes, as requested in the Sentencing Memorandum to either delay sentencing for a year or to refer Mr. KennedyPalmer to CAP/ATIP, that circumstance would constitute an "exceptional" reason for not remanding him into custody.

Participation in CAP/ATIP is geared towards individuals with backgrounds similar to Mr. KennedyPalmer – individuals with a history of drug abuse, sometimes having suffered trauma or mental health struggles, who have evidenced characteristics that rehabilitation can be achieved. Many in this district have pled guilty to drug charges which would otherwise require remand, and judges have allowed those individuals to remain out of custody to participate in CAP/ATIP. Thus, there is an implicit recognition that participation in CAP/ATIP constitutes an "exceptional reason" supporting continued release.

In sum, if this Court concludes a custodial sentence is warranted, Mr. KennedyPalmer asks this Court to allow him to self-surrender rather than remand him to custody.

DATE: October 26, 2020                    Respectfully submitted,


_____/s/_____
Scott A. Sugarman
Attorney Deantae KennedyPalmer